# EXHIBIT 1

to Declaration of Chris Swift in Response to
Defendants' Motion for Summary Judgment (Dkt. 167)

Confidential Subject to Protective Order

---

**Message**

| | |
|---|---|
| **From:** | Wilcox, Bryan S [/O=IRMMAIL/OU=MBX SERVERS - COW/CN=RECIPIENTS/CN=BSWILCOX] |
| **Sent:** | 5/27/2014 3:32:52 PM |
| **To:** | Asher, Nathalie R [/O=IRMMAIL/OU=MBX Servers - SEA/cn=Recipients/cn=nrasher] |
| **Subject:** | NotOneMore |

I don't recall this, occurred in the first week of May.

# UNDOCUMENTED LEADERS OF NWDC RESISTANCE MEET WITH MEMBERS OF HOUSE JUDICIARY COMMITTEE AND HOMELAND SECURITY OFFICIALS IN DC; LAWSUIT WITHDRAWN; ORGANIZING CONTINUES

Tacoma, WA – Last Thursday  two undocumented leaders of the Northwest Detention Center Resistance  met with four members of the House Judiciary Committee. The Congresspeople, all co-sponsors of  the Accountability in Immigration Detention Act, were Suzan DelBene (D-WA), Zoe Lofgren (D-CA), Ted Deutch (D-FL) and Joe Garcia (D-FL). The two leaders from NWDC Resistance were Jose Moreno, who helped organize the March 7 hunger strike inside the Northwest Detention Center and supported from the outside once he was released on bond, and Maru Mora Villalpando, who was a leader of the Feb. 24th action that delayed deportations for a week and led support for the hunger strike. "The fact that we were able to met with key Congressmembers means we undocumented immigrants are not longer being ignored. Our activism is paying off", said Maru Mora Villalpando in reference to the meeting.

On Friday they discussed the President's order to devise changes in the immigration system with top officials of the Department of Homeland Security, including Esther Olivares, council to Jeh Johnson and Tae Johnson, assistant director for custody management.  Moreno and Maru spoke with them about specific technical changes that need to be made to detention and deportation practices and provided stories of people in the detention center who are suffering as a result of ICE practices. The officials asked for more specifics and indicated that they are concerned about the history of failure for administration changes to make a difference in the field. "We were able to communicate with elected officials in Congress and DHS top administrators that we are human beings, and even in detention people should be treated as such" said Jose Moreno.

The hunger strikers expressed their appreciation for the ACLU and Columbia Legal Service in the wake of the voluntary dismissal of  the April 2nd federal lawsuit that vindicated their Free Speech rights.  The lawsuit was brought when twenty people in the NWDC were put in solitary confinement for engaging in a hunger strike to  protest the United States' immigration policies and poor conditions at the NWDC, a protest that gained national and international attention.  The hunger strikers were immediately released after the lawsuit was filed.

This fight to protect the rights of whistleblowers on detention conditions was successful because ICE was put on notice that the can't suppress peaceful protest without legal consequences. Knowing that retaliation will meet with strong public exposure and legal action will make it easier to continue organizing to expose the conditions in the immigration prison and the need to stop deportations and the use of prison-like detention for a civil process.

Bryan S. Wilcox
Deputy Field Office Director
ICE Enforcement & Removal Operations, Seattle, WA



| EXHIBIT | |
|---|---|
| | 1 |
| **DEPONENT NAME:** | **DATE:** |
| Wilcox, Bryan | 09/26/23 |

Exhibit 1
Page 1 of 1

# EXHIBIT 27

to Declaration of Chris Swift in Response to
Defendants' Motion for Summary Judgment (Dkt. 167)

The Honorable James L. Robart

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

NWDC RESISTANCE and COALITION OF
ANTI-RACIST WHITES,

Plaintiffs,

v.

IMMIGRATION & CUSTOMS
ENFORCEMENT, MATTHEW T. ALBENCE,
in his official capacity as Acting Director of
Immigration and Customs Enforcement; and
KEVIN MCALEENAN, in his official capacity
as Acting Secretary of Homeland Security,

Defendants.

CASE NO. 3:18-cv-05860-RBL

**PLAINTIFF NWDC
RESISTENCE'S RESPONSES
AND OBJECTIONS TO
DEFENDANTS' THIRD SET OF
REQUESTS FOR
PRODUCTION OF
DOCUMENTS AND THIRD SET
OF INTERROGATORIES**

Pursuant to Federal Rules of Civil Procedure 26, 33, and 34, Plaintiff NWDC

RESISTENCE ("La Resistencia"), by and through its undersigned attorneys, Davis Wright

Tremaine LLP, hereby responds to the Third Set of Requests for Production and the Third Set of

Interrogatories (the "Requests") of Defendants Immigration and Customs Enforcement, Matthew

T. Albence, and Kevin McAleenan as follows:

**GENERAL OBJECTIONS**

1.      La Resistencia objects to the Requests to the extent they or the Definitions or

Instructions seek to impose obligations beyond the scope of the Federal Rules of Civil Procedure

or the Local Civil Rules, or impose obligations on La Resistencia not imposed by those rules.

2.      La Resistencia reserves the right to use and to rely upon facts contained in

documents that have been or will be produced in this case, and the testimony of witnesses in this

case without being limited by its responses to these Interrogatories.

PLAINTIFF'S RESPONSES & OBJECTIONS TO DEFENDANTS' THIRD
DISCOVERY REQUESTS
3:18-cv-05860 - 1
4880-4169-5870v.1 0201359-000001

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

Exhibit 27

Page 1 of 7

3.      La Resistencia objects to the Requests, and to each and every item contained therein, to the extent that they attempt or purport to require disclosure of privileged or confidential communications between attorney and client, disclosure of documents or information protected by the work-product doctrine, or disclosure of documents involved in any other applicable privilege.  If, due to the volume of a document involved or any other reason, a production by La Resistencia includes any document that is otherwise privileged or protected from discovery, the production of such document is inadvertent and unintentional, and La Resistencia does not intend thereby to waive said privilege or protection.  La Resistencia objects to listing privileged documents created after the anticipation of litigation on a privilege log, including because it is unduly burdensome and invades privileged communications with outside counsel made for purposes of litigation.

4.      A response that La Resistencia will produce documents responsive to any individual Request does not imply that La Resistencia has located any responsive documents, but only that La Resistencia will produce all responsive, non-privileged documents that it locates through good faith efforts and reasonable diligence.

5.      La Resistencia objects to the Requests to the extent that they are not limited by an appropriate time period, or to the extent that they could be construed to cover a time period that is not relevant to the claims or defenses in this case.  Unless otherwise stated, La Resistencia's Responses herein apply to the time period from January 1, 2017 to the present.

6.      Because La Resistencia's investigation is ongoing, it reserves the right to correct, amend, modify, or supplement its responses to the Requests at any time in the future, as warranted by the circumstances, and to produce evidence at trial of subsequently discovered facts.

PLAINTIFF'S RESPONSES & OBJECTIONS TO DEFENDANTS' THIRD
DISCOVERY REQUESTS
3:18-cv-05860 - 2
4880-4169-5870v.1 0201359-000001

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

Exhibit 27
Page 2 of 7

**SPECIFIC RESPONSES AND OBJECTIONS TO INTERROGATORIES**

**INTERROGATORY NO. 10:**  During the deposition of La Resistencia's 30(b)(6) deponent, the witness testified that she deleted emails. Describe the witness's practice of deleting emails, La Resistencia's practice of deleting emails, and identify (a) whether La Resistencia relied or is relying on any of the deleted emails for any of La Resistencia's allegations in this litigation and (b) whether any of the deleted emails were responsive to the discovery requests the Defendants served in this litigation.

**ANSWER:**  La Resistencia objects to Interrogatory No. 10 to the extent that it misstates or mischaracterizes the deponent's testimony and assumes the existence of "deleted emails."

Subject to and without waiving these objections, La Resistencia responds that La Resistencia's email correspondence is generally conducted by its members using their personal email accounts, and La Resistencia does not have official or established policies or practices regarding email document retention.  As an individual, the deponent also does not have official or established policies or practices regarding email document retention.  As stated in the deposition, the deponent personally receives many emails and deletes some of those emails "every so often."  However, La Resistencia and the deponent have complied with their obligations to retain potentially relevant documents in reasonable anticipation of this litigation. This Interrogatory appears to refer to testimony regarding a March 2, 2017 CNN article and listserv emails related to the arrest and detention of Daniella Vargas in March 2017.  The CNN article was published on the internet and was never in the possession, custody, or control of La Resistencia or the deponent, but Plaintiffs' counsel has nevertheless located the article referred to in the deposition and produced a copy of it.  Examples of listserv emails regarding Daniela Vargas that were collected from the deponent and produced in this litigation include Resistencia000742 and Resistencia000746.  La Resistencia has no reason to believe that there are any "deleted emails" as referred to by this Interrogatory.  La Resistencia therefore is not relying on any such emails and cannot identify whether any such emails would have been responsive if they had existed.

PLAINTIFF'S RESPONSES & OBJECTIONS TO DEFENDANTS' THIRD
DISCOVERY REQUESTS
3:18-cv-05860 - 3
4880-4169-5870v.1 0201359-000001

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

Exhibit 27
Page 3 of 7

1  **SPECIFIC RESPONSES AND OBJECTIONS TO REQUESTS FOR PRODUCTION OF**

2  **DOCUMENTS**

3  **REQUEST FOR PRODUCTION NO. 32:**  For any individual that La Resistencia

4  contends reduced their participation due to the alleged targeting or selective enforcement based

5  on speech as alleged by Plaintiffs in this litigation, produce all communications between that

6  individual and La Resistencia, La Resistencia's leaders, or La Resistencia's organizers that

7  reflect that individual's participation or decision not to participate. This request includes, but is

8  not limited to emails, voice messages, text messages, and/or social media communications.

9  **ANSWER:**  La Resistencia objects to this Request as vague and ambiguous.  La

10  Resistencia interprets the phrase, "any individual that La Resistencia contends reduced their

11  participation" as referring exclusively to the individuals identified in La Resistencia's responses

12  to Defendants' Interrogatory No. 7.  La Resistencia interprets the phrase, "that reflect that

13  individual's participation or decision not to participate" to refer to an individual's decision to

14  participate or not participate in an event organized by La Resistencia.  La Resistencia further

15  objects to this Request to the extent that it seeks documents protected by the attorney-client

16  privilege, work product privilege, common interest privilege, joint defense privilege, or any other

17  applicable privilege.  La Resistencia further objects that this Request is duplicative of, or

18  encompassed by, previous requests, including Request Nos. 22, 24, and 25.

19  Subject to and without waiving these objections, La Resistencia will produce responsive,

20  non-privileged documents to the extent such documents exist and are identified through a

21  reasonable and diligent search.

22  DATED this 29th day of September, 2023

23  Davis Wright Tremaine LLP
   Attorneys for Plaintiffs

24

25  /s/ Ambika Kumar
   Bruce E.H. Johnson, WSBA # 7667

26  Ambika Kumar, WSBA #38237
   Emily Goodell, WSBA # 44349

27  Verónica Muriel Carrioni, WSBA #60777

PLAINTIFF'S RESPONSES & OBJECTIONS TO DEFENDANTS' THIRD
DISCOVERY REQUESTS
3:18-cv-05860 - 4
4880-4169-5870v.1 0201359-000001

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

Exhibit 27
Page 4 of 7

1              Chris Swift (*Pro Hac Vice*)
                Tina Salvato (*Pro Hac Vice*)

2              Trisha Parikh (*Pro Hac Vice*)
                Jean Fundakowski (*Pro Hac Vice*)

3              920 Fifth Avenue, Suite 3300
                Seattle, WA  98104-1610

4              Telephone: 206-622-3150
                Fax: 206-757-7700

5              brucejohnson@dwt.com
                ambikakumar@dwt.com

6              emilygoodell@dwt.com

7              veronicamuriel@dwt.com
                chrisswift@dwt.com

8              tinasalvato@dwt.com
                trishaparikh@dwt.com

9              jeanfundakowski@dwt.com

10             JUST FUTURES LAW

11             By */s/ Sejal Zota*

12                 Sejal Zota, admitted *pro hac vice*

13             By */s/ Dinesh McCoy*
                Dinesh McCoy, admitted *pro hac vice*

14             By */s/ Daniel Werner*

15                 Daniel Werner, admitted *pro hac vice*

16             95 Washington St, Suite 104-149
                Canton, MA 02021

17             Phone: 919-698-5015
                Email: sejal@justfutureslaw.org

18                       dinesh@justfutureslaw.org
                      daniel@justfutureslaw.org

19             *Attorneys for Plaintiffs*

20

21

22

23

24

25

26

27

PLAINTIFF'S RESPONSES & OBJECTIONS TO DEFENDANTS' THIRD
DISCOVERY REQUESTS
3:18-cv-05860 - 5
4880-4169-5870v.1 0201359-000001

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

Exhibit 27
Page 5 of 7

**VERIFICATION**

I verify under penalty of perjury under the laws of the United States of America that I have read the Responses And Objections To Defendants' Third Set of Interrogatories, and have provided full, truthful, and complete responses to each of them to the best of my ability pursuant to the Federal Rules of Civil Procedure.

Dated: September 24, 2023
Seattle, WA   [City/State]

Maru Mora-Villalpando

PLAINTIFF'S RESPONSES & OBJECTIONS TO DEFENDANTS' THIRD
DISCOVERY REQUESTS
3:18-cv-05860 - 6
4880-4169-5870v.1 0201359-000001

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax

Exhibit 27
Page 6 of 7

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

**CERTIFICATE OF SERVICE**

I hereby declare under penalty of perjury under the laws of the United States that, on the date set forth below, I caused a true and correct copy of the foregoing document to be served via U.S Postal Service first class mail and electronic mail to the following counsel:

Katie D. Fairchild
Annalisa Cravens
Joseph Fonesca
Assistant United States Attorney
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
Email: Katie.fairchild@usdoj.gov
Email: Annalisa.Cravens@usdoj.gov
Email: JFonseca@usa.doj.gov

Dated this 29th day of September, 2023.

*/s/ Ambika Kumar*
Ambika Kumar, WSBA #38237

PLAINTIFF'S RESPONSES & OBJECTIONS TO DEFENDANTS' THIRD
DISCOVERY REQUESTS
3:18-cv-05860 - 7
4880-4169-5870v.1 0201359-000001

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

Exhibit 27
Page 7 of 7

# EXHIBIT 31

to Declaration of Chris Swift in Response to
Defendants' Motion for Summary Judgment (Dkt. 167)



**Planet Depos®**
We Make It *Happen™*

CONFIDENTIAL

# Transcript of Scott Mechkowski

**Date:** July 23, 2021
**Case:** Dousa -v- U.S. Department of Homeland Security (DHS), et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**



EXHIBIT

3

DEPONENT NAME: S. Mechkowski   DATE: 9/27/23

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

Exhibit 31
Page 1 of 7

CONFIDENTIAL
Transcript of Scott Mechkowski
Conducted on July 23, 2021                    21

| | | |
|---|---|---|
| 1 | Q  All right.  I want to direction your | 09:31:07 |
| 2 | attention to the date of March 9, 2017. | 09:31:13 |
| 3 | Do you know who Ravi Ragbir is? | 09:31:20 |
| 4 | A  Yes, I do, sir. | 09:31:23 |
| 5 | Q  Do you remember that he had   that he had | 09:31:25 |
| 6 | a scheduled check in with ICE in your field office | 09:31:27 |
| 7 | on that day? | 09:31:29 |
| 8 | A  I believe it was that day, sir. | 09:31:31 |
| 9 | Q  And you're aware that Pastor Dousa has a | 09:31:33 |
| 10 | pastoral relationship with Mr. Ragbir? | 09:31:37 |
| 11 | A  You're telling me that now.  I didn't know | 09:31:40 |
| 12 | that before. | 09:31:43 |
| 13 | Q  Did you know that before I just asked that | 09:31:44 |
| 14 | question? | 09:31:47 |
| 15 | A  No. | 09:31:47 |
| 16 | MR. CORDERO:  Objection; asked and | 09:31:48 |
| 17 | answered. | 09:31:51 |
| 18 | THE WITNESS:  No. | 09:31:51 |
| 19 | BY MR. PERDUE: | 09:31:51 |
| 20 | Q  Were you   before today, were you aware | 09:31:52 |
| 21 | that Pastor Dousa and Mr. Ragbir had any kind of | 09:31:55 |
| 22 | relationship? | 09:31:59 |
| 23 | A  I assumed. | 09:31:59 |
| 24 | Q  Was Pastor Dousa present at that check in | 09:32:03 |
| 25 | on March 9, 2017? | 09:32:09 |

Exhibit 31
Page 2 of 7

CONFIDENTIAL

Transcript of Scott Mechkowski

Conducted on July 23, 2021                                  22

| | | |
|---|---|---|
| 1 | A  I don't recall. | 09:32:10 |
| 2 | Q  Tell me what you remember about that | 09:32:11 |
| 3 | check in. | 09:32:15 |
| 4 | A  I remember that I wasn't there.  I believe | 09:32:16 |
| 5 | I came in at the tail end of it when I tried to | 09:32:20 |
| 6 | get off the elevator on the ninth floor in the | 09:32:25 |
| 7 | federal building. | 09:32:26 |
| 8 | Q  So when you say you weren't there, what do | 09:32:26 |
| 9 | you mean by "there"? | 09:32:29 |
| 10 | A  I wasn't at the check in, so a supervisor | 09:32:30 |
| 11 | was taking care of the check in because they're | 09:32:34 |
| 12 | usually routine, and I was conducting other | 09:32:37 |
| 13 | business.  There was a commotion, and I went down | 09:32:41 |
| 14 | from when    I believe, ███████████ | 09:32:44 |
| 15 | ████████████████████████████ | 09:32:48 |
| 16 | ████████, and I couldn't get off the elevator. | 09:32:49 |
| 17 | Q  So why did you go down from the tenth | 09:32:53 |
| 18 | floor to the ninth floor? | 09:32:56 |
| 19 | A  I believe I just stated there was a | 09:32:57 |
| 20 | commotion.  There was lots of noise. | 09:32:58 |
| 21 | Q  Somebody told you that there was | 09:33:01 |
| 22 | commotion? | 09:33:03 |
| 23 | A  No, I could hear it. | 09:33:03 |
| 24 | Q  So while    can you describe what you saw | 09:33:05 |
| 25 | when the    when the elevator doors opened on the | 09:33:10 |

Exhibit 31
Page 3 of 7

CONFIDENTIAL
Transcript of Scott Mechkowski
Conducted on July 23, 2021                    23

| | | |
|---|---|---|
| 1 | ninth floor? | 09:33:15 |
| 2 | A  In my own words, chaos. | 09:33:15 |
| 3 | Q  Can you describe with more particularity | 09:33:21 |
| 4 | what was chaotic about it? | 09:33:24 |
| 5 | A  There was no room to move off the | 09:33:25 |
| 6 | elevator.  There was people screaming, people | 09:33:27 |
| 7 | banging.  There was a lot of yelling going on, and | 09:33:29 |
| 8 | I was trying to make may way into the lobby where | 09:33:34 |
| 9 | people come to check in at. | 09:33:38 |
| 10 | Q  Can you describe the layout of the ninth | 09:33:40 |
| 11 | floor? | 09:33:44 |
| 12 | A  Okay. | 09:33:44 |
| 13 | | 09:33:47 |
| 14 | | 09:33:51 |
| 15 | | 09:33:57 |
| 16 | | 09:34:00 |
| 17 | | 09:34:03 |
| 18 | | 09:34:09 |
| 19 | | 09:34:13 |
| 20 | | 09:34:15 |
| 21 | | 09:34:17 |
| 22 | | 09:34:23 |
| 23 | Q  So what did you do when you   when the | 09:34:24 |
| 24 | elevator doors opened and you looked out and saw | 09:34:27 |
| 25 | what you described as chaos? | 09:34:30 |

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

Exhibit 31
Page 4 of 7

CONFIDENTIAL
Transcript of Scott Mechkowski
Conducted on July 23, 2021                           24

| | | |
|---|---|---|
| 1 | A  I was trying to figure out what was going | 09:34:32 |
| 2 | on, and then the security   there were several | 09:34:34 |
| 3 | security people form the federal building there | 09:34:38 |
| 4 | and they recognized me, and they asked me to help | 09:34:41 |
| 5 | them to try to get the people off the floor. | 09:34:43 |
| 6 | Q  And what did you do? | 09:34:45 |
| 7 | A  I was trying to find out who was in charge | 09:34:46 |
| 8 | and what was going on because I didn't   I'd | 09:34:53 |
| 9 | never seen anything like that before in my career, | 09:34:54 |
| 10 | so I immediately walked into the lobby where all | 09:34:56 |
| 11 | the of the people that report were with their | 09:35:02 |
| 12 | kids.  The family units report there, there were | 09:35:05 |
| 13 | children.  And I tried to the close the door so | 09:35:08 |
| 14 | that nobody would get harmed.  And I was afraid | 09:35:11 |
| 15 | that somebody would get trampled on.  And I | 09:35:15 |
| 16 | remember   I remember after that, the guard was | 09:35:19 |
| 17 | calling for backup, and there was people screaming | 09:35:22 |
| 18 | and yelling, so... | 09:35:26 |
| 19 | Q  Which door were you trying to close? | 09:35:27 |
| 20 | A  A door that led into the ICE's waiting | 09:35:29 |
| 21 | room. | 09:35:34 |
| 22 | Q  Okay.  And what happened next after you | 09:35:35 |
| 23 | tried to close that door? | 09:35:39 |
| 24 | A  I don't recall.  I do know that there was | 09:35:42 |
| 25 | somebody that got into my personal space and was | 09:35:54 |

Exhibit 31
Page 5 of 7

CONFIDENTIAL
Transcript of Scott Mechkowski
Conducted on July 23, 2021                              25

| | | |
|---|---|---|
| 1 | screaming and yelling.  They recognized who I was. | 09:35:59 |
| 2 | At first, I didn't know who this person was, and I | 09:36:00 |
| 3 | had asked them to all depart and leave because FPS | 09:36:04 |
| 4 | was coming down. | 09:36:09 |
| 5 | Q   Who's FPS? | 09:36:09 |
| 6 | A   The Federal Protective Service. | 09:36:10 |
| 7 | Q   And did you later learn who this person | 09:36:13 |
| 8 | was who was | 09:36:14 |
| 9 | A   Oh, absolutely, yes.  Jumaane Williams. | 09:36:15 |
| 10 | MR. CORDERO:  You got to wait until he | 09:36:19 |
| 11 | finishes his question. | 09:36:22 |
| 12 | THE WITNESS:  Okay.  Yeah. | 09:36:33 |
| 13 | BY MR. PERDUE: | 09:36:33 |
| 14 | Q   At the time, did you know who any of the | 09:36:34 |
| 15 | people in the hallway were? | 09:36:36 |
| 16 | A   I didn't recognize anybody. | 09:36:38 |
| 17 | Q   When you say you didn't recognize them, | 09:36:40 |
| 18 | that means you didn't know their names? | 09:36:49 |
| 19 | A   It's safe to say, yes. | 09:36:50 |
| 20 | Q   Did you know anything else about them? | 09:36:53 |
| 21 | A   Nothing, sir. | 09:36:56 |
| 22 | Q   Did you recognize anyone who appeared to | 09:36:57 |
| 23 | be clergy? | 09:37:03 |
| 24 | A   Sir, no.  There was so much chaos there | 09:37:04 |
| 25 | that when the guard was asking for help, my | 09:37:10 |

Exhibit 31
Page 6 of 7

```
 1              C E R T I F I C A T E

 2

 3        I, Leonora L. Walker, a Notary Public, the

 4   officer before whom the foregoing deposition was

 5   taken, do hereby certify that the foregoing

 6   transcript is a true and correct record of the

 7   testimony given; that said testimony was taken by

 8   me stenographically and thereafter reduced to

 9   typewriting under my supervision; that reading and

10   signing was requested; and that I am neither

11   counsel for or related to, nor employed by any of

12   the parties to this case and have no interest,

13   financial or otherwise, in its outcome.

14        IN WITNESS WHEREOF, I have hereunto set my

15   hand and affixed my notarial seal this 11th day of

16   August, 2021.

17        My commission expires May 17, 2024.

18

19

20        Leonora Walker

21        NOTARY PUBLIC IN AND FOR THE

22        STATE OF NEW YORK

23        Notary Registration No. 01WA6109670

24

25
```

Exhibit 31
Page 7 of 7

# EXHIBIT 40

to Declaration of Chris Swift in Response to
Defendants' Motion for Summary Judgment (Dkt. 167)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RAVIDATH LAWRENCE RAGBIR, *et al.*,

*Plaintiffs,*

v.

THOMAS D. HOMAN, *et al.*,

*Defendants.*

Civil Action No. 18-cv-1159 (PKC)

<u>DECLARATION OF FIELD OFFICE
DIRECTOR THOMAS R. DECKER</u>

Pursuant to 28 U.S.C. § 1746, I, Thomas Decker, hereby declare as follows:

1.     I am the Field Office Director for the New York Field Office at U.S. Immigration and Customs Enforcement ("ICE"), New York Field Office, Enforcement and Removal Operations ("NY ERO"), within the U.S. Department of Homeland Security ("DHS"). I have served in this capacity since January 2017. Prior to assuming this position, I served as the Field Office Director in the Philadelphia Field Office since 2004. Before that, I held various positions within ICE and legacy Immigration and Naturalization Service since 1993, including Immigration Examiner, Deportation Officer, Supervisory Detention and Deportation Officer, Deputy Field Office Director and Acting Field Office Director.

2.     In my current position as Field Office Director for the NY ERO, I oversee, direct, and coordinate operational activities within the NY ERO's area of responsibility. This includes the planning, directing, managing, and coordinating of operational functions relating to the identification, apprehension, transportation, and detention of aliens to be placed into removal proceedings and those ordered removed, and the execution of final orders of removal. Under my supervision, ICE deportation officers conduct enforcement operations every day as part of the



| EXHIBIT |
| I |
| DEPONENT NAME: | DATE: |
| Decker, Tom | 10/06/23 |

Exhibit 40
Page 1 of 20

agency's ongoing efforts to protect the nation, uphold public safety, and protect the integrity of our immigration laws and border controls.

3.     This declaration is based on my personal knowledge, as well as my consultation with my colleagues, and ICE electronic records and databases.

### The President's Executive Order and Secretary Kelly's Memorandum

4.     On January 25, 2017, President Donald J. Trump issued an executive order entitled Enhancing Public Safety in the Interior of the United States.  In that executive order, the President directed DHS to prioritize for removal, among others, aliens who have been convicted of any criminal offense.

5.     On February 20, 2017, then-Secretary of Homeland Security John Kelly issued a memorandum entitled Enforcement of the Immigration Laws to Serve the National Interest, to implement the aforementioned executive order.  In that memorandum, Secretary Kelly noted that ICE should prioritize the removal of aliens who, among other things, have criminal convictions and are subject to final orders of removal.  A copy of Secretary Kelly's memorandum is attached hereto as Exhibit A.

### Aliens Subject to Removal Orders: Orders of Supervision and Administrative Stays

6.     ICE conducts investigative and enforcement operations to implement the United States immigration laws.  In addition to its headquarters in Washington, D.C., ICE operates through regional field offices throughout the country.

7.     ICE carries out the arrest, detention, and removal of aliens in accordance with its statutory and regulatory authority, taking into account the totality of the alien's case as well as operational considerations, public safety, and security.

Exhibit 40
Page 2 of 20

8.      For aliens subject to final orders of removal, ICE, as an exercise of its discretion, may release an alien from detention pending removal following a post-order custody review (POCR). Following a POCR, ICE may decide to release an alien where it is determined that ICE is at present unable to remove the alien because, for instance, ICE has not received a travel document for the alien, the home country will not accept the return of the alien, or a federal court of appeals has stayed removal pending review of an alien's removal order (or, in the Second Circuit, based on the operation of the forbearance policy, under which ICE agrees to forbear removal while an alien's petition for review and a motion for a stay of removal both remain pending).  An alien released subsequent to a POCR will be placed on an order of supervision (OSUP) which sets forth reporting requirements and other conditions of release.

9.      Regardless of the circumstances, ICE is not required to place an alien under an OSUP. No alien has a right to remain out of custody on an OSUP, and no alien is entitled to, or has any right to continued release under an OSUP, despite the favorable exercise of discretion in the past.  ICE may revoke an alien's release under an OSUP and detain the alien when the alien violates any conditions of release, when the purposes of release have been served, when ICE determines that release would no longer be appropriate, or when the conduct of the alien, or any other circumstance, indicates that release would no longer be appropriate.

10.     For aliens subject to final orders of removal, ICE, as an exercise of its discretion, also may grant an alien a temporary administrative stay (or deferral) of removal.  ICE may grant such an administrative stay when, for example, the alien has a pending, non-frivolous motion or application for relief from removal, or when the alien or one of the alien's immediate family members require immediate necessary medical treatment.

Exhibit 40
Page 3 of 20

11.     Regardless of the circumstances, ICE is not required to grant an alien a temporary administrative stay of removal.  No alien has a right to an administrative stay of removal, and no alien is entitled to, or has any right to receive, additional administrative stays of removal, despite the favorable exercise of discretion in the past.  ICE may also exercise its discretion to revoke the grant of an administrative stay of removal at any time and for any reason.

**Proceedings Involving Mr. Ragbir in Early 2017**

12.     I became the Field Office Director for NY ERO in January 2017.  Before then, Christopher Shanahan served as the Field Office Director for NY ERO, a position he had held for approximately twelve years.

13.     Shortly after I entered on duty as Field Office Director for NY ERO, I asked my staff to alert me of any cases that I should be aware of, given that I was new to the New York Field Office.  At that time, my staff informed me of several cases, including those involving Mr. Ragbir and Jean Montrevil ("Mr. Montrevil"), both of whom were subject to final orders of removal and were released on OSUPs pending removal.  These cases were noteworthy because their removal potentially could garner media attention.

14.     In February or March 2017, I held the first of a number of quarterly meetings with representatives of advocacy organizations, which included religious groups, not-for-profit organizations, and attorneys/members of the American Immigration Lawyers Association.  At that first meeting, I introduced myself as the new Field Office Director and explained how I viewed my role.  I explained that I could not speak for my predecessor but that I intended to carefully scrutinize requests for administrative stays of removal, and that I would grant such stays only in extraordinary cases.  I placed everyone on notice that no alien should expect to receive an administrative stay of removal just because he or she received a previous grant of

Exhibit 40
Page 4 of 20

administrative grace.  I stated that if the subject has a final order and there are no legal

impediments preventing removal, I will execute the order of removal.

15.     Alina Das approached me at the end of the meeting, introduced herself, and

informed me that she represented Mr. Ragbir, an alien who was subject to a final removal order

and who previously had been granted administrative stays of removal while being released on an

OSUP—most recently, a two-year administrative stay in January 2016 that would expire on

January 19, 2018.

16.     Mr. Ragbir was scheduled to report to ICE on March 9, 2017.  In advance of that

reporting date, I asked my staff to review Mr. Ragbir's file.  Based on discussions with my staff

and review of the file, it was unclear to me why Mr. Ragbir had been granted a two-year

administrative stay of removal.  Regardless, in my view, there were no factors warranting an

extension of that administrative stay upon its expiration in January 2018.  Further, I did not

believe that there was any basis at that time for the existing administrative stay of removal;

nonetheless, I decided not to revoke the stay that had been granted by FOD Shanahan.

17.     On March 9, 2017, Mr. Ragbir reported to ICE as scheduled.  I did not meet with

Mr. Ragbir, but a Deportation Officer ("DO") met with him.  The DO asked Mr. Ragbir to apply

for a passport or other travel document at the Consulate of Trinidad and Tobago, as required

under his OSUP, and then report back to ICE on April 11, 2017.  I later learned that, when Mr.

Ragbir reported to ICE on March 9, a large crowd of people gathered inside the federal building

and within the check-in area, creating a potential public safety and security issue.

18.     On or about April 5, 2017, I attended another meeting with advocates.  Ms. Das

was present.  At the end of the meeting, Ms. Das approached me to discuss Mr. Ragbir's case.

She informed me that Mr. Ragbir had applied for a passport at the consulate as directed by ICE,

Exhibit 40
Page 5 of 20

and she presented proof of the same. Ms. Das then asked me whether Mr. Ragbir would still be required to report to ICE on April 11, 2017. I informed Ms. Das that Mr. Ragbir did not have to report in light of the proof that he had complied with ICE's request to apply for a passport or travel document. Mr. Ragbir's next reporting date was scheduled for January 11, 2018.

### Mr. Ragbir's Request for a Renewed Administrative Stay of Removal

19. Sometime after the April 5, 2017, meeting, Ms. Das asked me when she should submit a request for a renewed administrative stay of removal on behalf of Mr. Ragbir. I told her to submit the request before Christmas, given that the current stay was scheduled to expire in January 2018. On or around November 16, 2017, Ms. Das submitted her request for a renewed administrative stay of Mr. Ragbir's removal.

20. Ms. Das sought another two-year administrative stay of removal for Mr. Ragbir on the ground that he was still seeking relief from removal by challenging his 2001 criminal conviction (for conspiracy to commit wire fraud, and wire fraud) through a coram nobis petition in the District of New Jersey, and by applying for a presidential pardon to remove his conviction. In her request, Ms. Das also argued that Mr. Ragbir's equities (*e.g.*, rehabilitation, family and community support, etc.) justified a further additional administrative stay of removal.

21. Upon receipt of the stay request, I worked closely with my staff and legal counsel to consider the request. In December 2017, I decided not to exercise discretion to grant Mr. Ragbir a further administrative stay of removal. I determined that an additional stay was not warranted because Mr. Ragbir already had been given sufficient time to pursue appeals of his final removal order and had, in fact, pursued numerous challenges to that order. In addition, I viewed his current challenges as having a low likelihood of success, especially in light of the previous voluntary dismissal of a coram nobis petition. Further, the equities that Ms. Das cited

Exhibit 40
Page 6 of 20

did not warrant granting an additional administrative stay of removal. It was at that time that I decided ICE would move forward with enforcing Mr. Ragbir's final order of removal.

22.  My decision to deny the stay request was not based on Mr. Ragbir's political activism or public statements. Rather, he simply is an alien who was convicted of an aggravated felony and is subject to a final order of removal.

### ICE's Preparations to Remove Mr. Ragbir Pursuant to His Final Removal Order

23.  Once a decision to enforce a removal order is made, the facts and circumstances of a case are considered in determining how to accomplish the removal in the most efficient and safest way possible.

24.  An apprehension and removal can occur in any number of ways. For example, the alien may be arrested in public or at a residence; the alien may be allowed to report at the next-scheduled reporting date and be taken into custody then; the alien may be allowed to report at the next-scheduled reporting date and then be told to report for removal on a set date; or the alien could be asked to self-depart (*i.e.*, leave the country on his or her own within a certain period of time).

25.  Here, the decision was made to apprehend Mr. Ragbir on or about January 3, 2018, the week before his next-scheduled reporting date.

26.  This decision was made based on the facts and circumstances of Mr. Ragbir's case, and other operational and strategic considerations, including protecting public safety and the safety of ICE officers. In that regard, I believed that Mr. Ragbir was unlikely to self-depart from the United States or report to ICE for removal on a set date.

27.  Also relevant was the fact that another alien with a final removal order and who was under an OSUP, Mr. Montrevil, was scheduled to report to ICE on January 16, 2018.

Exhibit 40
Page 7 of 20

28.     On January 30, 1990, Mr. Montrevil was convicted in the criminal division of the Botetourt County Circuit Court in Virginia of possession with the intent to distribute cocaine and conspiracy to possess with the intent to distribute cocaine.   On March 22, 1990, he was convicted in the criminal division of the Botetourt County Circuit Court in Virginia of malicious wounding.  He was sentenced to a total of thirty years' imprisonment on these charges.  He received a final removal order in October 1994.  In 2000, Mr. Montrevil was released from prison, and in 2005, ICE took him into custody for removal.  However, Mr. Montrevil filed belated challenges to his removal order, and ICE released him on an OSUP in August 2005.  ICE detained Mr. Montrevil again in December 2009 for removal, and while Mr. Montrevil was on the airplane being removed, the plane had to return because a passenger had a fever.  Another attempt to remove Mr. Montrevil in 2010 was aborted due to a devastating earthquake in Haiti, which resulted in a suspension of all removals to Haiti.  Mr. Montrevil was again released from ICE custody on an OSUP.  He last reported to ICE on July 20, 2017, after which he was instructed to report on January 16, 2018.

29.     I made the decision to enforce Mr. Montrevil's removal order and to repatriate him to Haiti in December 2017.  My decision was based simply on the fact that Mr. Montrevil is an alien who was convicted of an aggravated felony and was subject to a final order of removal.

30.     In late 2017 and early 2018, ICE Air Operations chartered flights periodically to Haiti for purposes of removal depending on the demand.  Once I made the decision to execute Mr. Montrevil's removal order, the next available charter was scheduled to depart on January 16, 2018.  Initially, we had planned to take Mr. Montrevil into custody on January 12, 2018, and transport him to Miami, Florida the same day for processing purposes, in advance of the January 16 removal flight.  However, we were advised that aliens nominated for the January 16 charter

Exhibit 40
Page 8 of 20

must be transferred to Miami by January 4, 2018, so that ICE Miami and ICE Health Service Corps would have sufficient time to address any medical issues or any other issues that arose before the alien would be placed on the charter flight. As a result, we decided to take Mr. Montrevil into custody on January 3, 2018, for transport to Miami the following day.

31.    Because the time period for Mr. Montrevil's apprehension was limited by the requirement to place him on the January 16 charter flight, I decided that ICE should take both Mr. Montrevil and Mr. Ragbir into custody on January 3, 2018. I did so because I was concerned that if we apprehended one of them first then the other one might be tipped off to the apprehension and go into hiding to avoid removal.

32.    I made the decisions to attempt to remove Mr. Ragbir and Mr. Montrevil independently of each other. Their involvement in the New Sanctuary Coalition or any other advocacy organization played no role in my determination to enforce their removal orders at that time. Both Mr. Ragbir and Mr. Montrevil had criminal convictions and were subject to final orders of removal. As such, they were prioritized for removal under the President's January 2017 executive order, and then-Secretary Kelly's February 2017 memorandum. They were not targeted or singled out for their participation in advocacy organizations or as self-proclaimed activists.

### ICE Attempts to Enforce Mr. Ragbir's Final Order of Removal

33.    On January 3, 2018, ICE obtained a travel document for Mr. Ragbir from the Consulate of Trinidad and Tobago, which was valid from January 7, 2018 until January 14, 2018.

34.    On and around January 3, 2018, as part of the operational plan to take Mr. Ragbir and Mr. Montrevil into custody for removal, ICE officers conducted routine surveillance of these

Exhibit 40
Page 9 of 20

individuals.  ICE officers apprehended Mr. Montrevil on January 3, but were unable to apprehend Mr. Ragbir.  I later learned that Mr. Montrevil sent Mr. Ragbir a text message informing him that he had been taken into custody, and Mr. Ragbir then sought sanctuary in a church to avoid apprehension.

35.     On January 4, 2018, Mr. Montrevil was transported to Miami as planned.  He was detained at the Krome detention center for staging and preparation for removal on the January 16 charter flight to Haiti.  On January 16, 2018, the Board of Immigration Appeals denied Mr. Montrevil's pending motion to reopen his removal proceedings, and Mr. Montrevil was removed to Haiti via the charter flight that same day.

36.     Because we were unable to apprehend Mr. Ragbir as planned on January 3, and because he had sought sanctuary inside a church to avoid apprehension, I decided that ICE should take Mr. Ragbir into custody at his scheduled reporting on January 11, 2018, assuming he reported as required.  The plan was to take him into custody and transport him to Miami that same day, and then effectuate his removal to Trinidad and Tobago the following day, January 12, 2018.

37.     My decision to transport Mr. Ragbir from the New York area to Miami on the same day as his arrest was based on operational considerations.  Specifically, I was concerned that protests or demonstrations could be triggered by his arrest.  Accordingly, I decided to move Mr. Ragbir out of the area quickly in an effort to protect Mr. Ragbir, the demonstrators, my staff, and the general public from harm.  I did not make this operational decision based on the contents of Mr. Ragbir's public statements or his participation in any demonstrations or as an activist.

38.     On January 11, 2018, Mr. Ragbir reported as scheduled.  Mr. Ragbir, his wife, Amy Gottlieb, and his attorney, Alina Das, met with Deputy Field Office Director Scott

Exhibit 40
Page 10 of 20

Mechkowski and Assistant Field Office Director Hector Medina.  I did not meet with Mr. Ragbir.  Mr. Ragbir was informed I had decided not to grant his request for another administrative stay of removal, and that ICE would be revoking his OSUP and taking him into custody to enforce his removal order.

39.     Immediately after my staff informed Mr. Ragbir that he was being taken into custody, a large crowd gathered outside of the federal building.

40.     I learned that Mr. Ragbir appeared to lose consciousness during his reporting appointment.  An ambulance was called to transport him to a hospital.  After Mr. Ragbir was escorted to the ambulance and the ambulance left the federal building, demonstrators rushed to the street to block the path of the ambulance to prevent it from taking Mr. Ragbir away.  The New York Police Department responded, arrested a number of demonstrators, and cleared the path for the emergency vehicle to transport Mr. Ragbir to the hospital.

41.     Once Mr. Ragbir was medically cleared to travel and discharged from the hospital, ICE officers transported him to Newark International Airport, where ICE had scheduled Mr. Ragbir on a 4:13 p.m. flight to Miami in anticipation of his removal the next day to Trinidad and Tobago.

42.     On the same day that Mr. Ragbir was taken into custody, his lawyer filed a petition for writ of habeas corpus and a motion for an order to show cause in the U.S. District Court for the Southern District of New York ("SDNY").  That same day, the district court issued an order staying Mr. Ragbir's removal and restraining ICE from transferring Mr. Ragbir out of the New York area.

Exhibit 40
Page 11 of 20

43.     After learning of the district court's order, ICE put Mr. Ragbir's removal on hold and arranged for Mr. Ragbir to be detained at the Krome detention facility in Miami until the stay could be lifted and his removal effected.

44.     On the evening of January 15, 2018, I made the decision to return Mr. Ragbir to the New York area during the pendency of his habeas proceeding in SDNY.  Mr. Ragbir was flown from Miami to Newark on January 18, 2018, and he was thereafter detained at the Orange County Correctional Facility in Goshen, New York.

**Events After Mr. Ragbir's Release from Custody**

45.     On January 29, 2018, the district court granted Mr. Ragbir's habeas petition and ordered that he be released so that he had time to get his affairs in order before being removed. That same evening, ICE released Mr. Ragbir on an OSUP, and Mr. Ragbir was directed to report to ICE on February 10, 2018, for removal.

46.     On February 9, 2018, Mr. Ragbir and five organizations filed another lawsuit in SDNY and informed ICE that they intended to file a motion for a preliminary injunction.  ICE voluntarily agreed to temporarily stay Mr. Ragbir's removal pending the resolution of the motion for a preliminary injunction.  As a result, ICE canceled Mr. Ragbir's February 10 report date and directed that he report on March 15, 2018, and to be prepared for removal at that time (assuming no stay was in place).  ICE later moved that date to March 16, 2018.  Mr. Ragbir remains under an order of supervision, and he is currently scheduled to report to ICE on March 16, 2018.

Executed at New York, New York

Exhibit 40
Page 12 of 20

This 7th day of March, 2018.

THOMAS R. DECKER
Field Office Director, New York
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

Exhibit 40
Page 13 of 20

# EXHIBIT A

Exhibit 40
Page 14 of 20

*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528



February 20, 2017

MEMORANDUM FOR:    Kevin McAleenan
Acting Commissioner
U.S. Customs and Border Protection

Thomas D. Homan
Acting Director
U.S. Immigration and Customs Enforcement

Lori Scialabba
Acting Director
U.S. Citizenship and Immigration Services

Joseph B. Maher
Acting General Counsel

Dimple Shah
Acting Assistant Secretary for International Affairs

Chip Fulghum
Acting Undersecretary for Management

FROM:    John Kelly
Secretary

SUBJECT:    **Enforcement of the Immigration Laws to Serve the National Interest**

    This memorandum implements the Executive Order entitled "Enhancing Public Safety in the Interior of the United States," issued by the President on January 25, 2017. It constitutes guidance for all Department personnel regarding the enforcement of the immigration laws of the United States, and is applicable to the activities of U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS). As such, it should inform enforcement and removal activities, detention decisions, administrative litigation, budget requests and execution, and strategic planning.

Exhibit 40
Page 15 of 20

With the exception of the June 15, 2012, memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," and the November 20, 2014 memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents,"[1] all existing conflicting directives, memoranda, or field guidance regarding the enforcement of our immigration laws and priorities for removal are hereby immediately rescinded—to the extent of the conflict—including, but not limited to, the November 20, 2014, memoranda entitled "Policies for the Apprehension, Detention and Removal of Undocumented Immigrants," and "Secure Communities."

## A. The Department's Enforcement Priorities

Congress has defined the Department's role and responsibilities regarding the enforcement of the immigration laws of the United States. Effective immediately, and consistent with Article II, Section 3 of the United States Constitution and Section 3331 of Title 5, United States Code, Department personnel shall faithfully execute the immigration laws of the United States against all removable aliens.

Except as specifically noted above, the Department no longer will exempt classes or categories of removable aliens from potential enforcement. In faithfully executing the immigration laws, Department personnel should take enforcement actions in accordance with applicable law. In order to achieve this goal, as noted below, I have directed ICE to hire 10,000 officers and agents expeditiously, subject to available resources, and to take enforcement actions consistent with available resources. However, in order to maximize the benefit to public safety, to stem unlawful migration and to prevent fraud and misrepresentation, Department personnel should prioritize for removal those aliens described by Congress in Sections 212(a)(2), (a)(3), and (a)(6)(C), 235(b) and (c), and 237(a)(2) and (4) of the Immigration and Nationality Act (INA).

Additionally, regardless of the basis of removability, Department personnel should prioritize removable aliens who: (1) have been convicted of any criminal offense; (2) have been charged with any criminal offense that has not been resolved; (3) have committed acts which constitute a chargeable criminal offense; (4) have engaged in fraud or willful misrepresentation in connection with any official matter before a governmental agency; (5) have abused any program related to receipt of public benefits; (6) are subject to a final order of removal but have not complied with their legal obligation to depart the United States; or (7) in the judgment of an immigration officer, otherwise pose a risk to public safety or national security. The Director of ICE, the Commissioner of CBP, and the Director of USCIS may, as they determine is appropriate, issue further guidance to allocate appropriate resources to prioritize enforcement activities within these categories—for example, by prioritizing enforcement activities against removable aliens who are convicted felons or who are involved in gang activity or drug trafficking.

---

[1] The November 20, 2014, memorandum will be addressed in future guidance.

Exhibit 40
Page 16 of 20

### B. Strengthening Programs to Facilitate the Efficient and Faithful Execution of the Immigration Laws of the United States

Facilitating the efficient and faithful execution of the immigration laws of the United States—and prioritizing the Department's resources—requires the use of all available systems and enforcement tools by Department personnel.

Through passage of the immigration laws, Congress established a comprehensive statutory regime to remove aliens expeditiously from the United States in accordance with all applicable due process of law. I determine that the faithful execution of our immigration laws is best achieved by using all these statutory authorities to the greatest extent practicable. Accordingly, Department personnel shall make full use of these authorities.

Criminal aliens have demonstrated their disregard for the rule of law and pose a threat to persons residing in the United States. As such, criminal aliens are a priority for removal. The Priority Enforcement Program failed to achieve its stated objectives, added an unnecessary layer of uncertainty for the Department's personnel, and hampered the Department's enforcement of the immigration laws in the interior of the United States. Effective immediately, the Priority Enforcement Program is terminated and the Secure Communities Program shall be restored. To protect our communities and better facilitate the identification, detention, and removal of criminal aliens within constitutional and statutory parameters, the Department shall eliminate the existing Forms I-247D, I-247N, and I-247X, and replace them with a new form to more effectively communicate with recipient law enforcement agencies. However, until such forms are updated they may be used as an interim measure to ensure that detainers may still be issued, as appropriate.

ICE's Criminal Alien Program is an effective tool to facilitate the removal of criminal aliens from the United States, while also protecting our communities and conserving the Department's detention resources. Accordingly, ICE should devote available resources to expanding the use of the Criminal Alien Program in any willing jurisdiction in the United States. To the maximum extent possible, in coordination with the Executive Office for Immigration Review (EOIR), removal proceedings shall be initiated against aliens incarcerated in federal, state, and local correctional facilities under the Institutional Hearing and Removal Program pursuant to section 238(a) of the INA, and administrative removal processes, such as those under section 238(b) of the INA, shall be used in all eligible cases.

The INA § 287(g) Program has been a highly successful force multiplier that allows a qualified state or local law enforcement officer to be designated as an "immigration officer" for purposes of enforcing federal immigration law. Such officers have the authority to perform all law enforcement functions specified in section 287(a) of the INA, including the authority to investigate, identify, apprehend, arrest, detain, and conduct searches authorized under the INA, under the direction and supervision of the Department.

There are currently 32 law enforcement agencies in 16 states participating in the 287(g)

3

Exhibit 40

Page 17 of 20

Program. In previous years, there were significantly more law enforcement agencies participating in the 287(g) Program. To the greatest extent practicable, the Director of ICE and Commissioner of CBP shall expand the 287(g) Program to include all qualified law enforcement agencies that request to participate and meet all program requirements. In furtherance of this direction and the guidance memorandum, "Implementing the President's Border Security and Immigration Enforcement Improvements Policies" (Feb. 20, 2017), the Commissioner of CBP is authorized, in addition to the Director of ICE, to accept State services and take other actions as appropriate to carry out immigration enforcement pursuant to section 287(g) of the INA.

### C. Exercise of Prosecutorial Discretion

Unless otherwise directed, Department personnel may initiate enforcement actions against removable aliens encountered during the performance of their official duties and should act consistently with the President's enforcement priorities identified in his Executive Order and any further guidance issued pursuant to this memorandum. Department personnel have full authority to arrest or apprehend an alien whom an immigration officer has probable cause to believe is in violation of the immigration laws. They also have full authority to initiate removal proceedings against any alien who is subject to removal under any provision of the INA, and to refer appropriate cases for criminal prosecution. The Department shall prioritize aliens described in the Department's Enforcement Priorities (Section A) for arrest and removal. This is not intended to remove the individual, case-by-case decisions of immigration officers.

The exercise of prosecutorial discretion with regard to any alien who is subject to arrest, criminal prosecution, or removal in accordance with law shall be made on a case-by-case basis in consultation with the head of the field office component, where appropriate, of CBP, ICE, or USCIS that initiated or will initiate the enforcement action, regardless of which entity actually files any applicable charging documents: CBP Chief Patrol Agent, CBP Director of Field Operations, ICE Field Office Director, ICE Special Agent-in-Charge, or the USCIS Field Office Director, Asylum Office Director or Service Center Director.

Except as specifically provided in this memorandum, prosecutorial discretion shall not be exercised in a manner that exempts or excludes a specified class or category of aliens from enforcement of the immigration laws. The General Counsel shall issue guidance consistent with these principles to all attorneys involved in immigration proceedings.

### D. Establishing the Victims of Immigration Crime Engagement (VOICE) Office

Criminal aliens routinely victimize Americans and other legal residents. Often, these victims are not provided adequate information about the offender, the offender's immigration status, or any enforcement action taken by ICE against the offender. Efforts by ICE to engage these victims have been hampered by prior Department of Homeland Security (DHS) policy extending certain Privacy Act protections to persons other than U.S. citizens and lawful permanent residents, leaving victims feeling marginalized and without a voice. Accordingly, I am establishing the Victims of Immigration Crime Engagement (VOICE) Office within the Office of

4

Exhibit 40
Page 18 of 20

the Director of ICE, which will create a programmatic liaison between ICE and the known victims of crimes committed by removable aliens. The liaison will facilitate engagement with the victims and their families to ensure, to the extent permitted by law, that they are provided information about the offender, including the offender's immigration status and custody status, and that their questions and concerns regarding immigration enforcement efforts are addressed.

To that end, I direct the Director of ICE to immediately reallocate any and all resources that are currently used to advocate on behalf of illegal aliens (except as necessary to comply with a judicial order) to the new VOICE Office, and to immediately terminate the provision of such outreach or advocacy services to illegal aliens.

Nothing herein may be construed to authorize disclosures that are prohibited by law or may relate to information that is Classified, Sensitive but Unclassified (SBU), Law Enforcement Sensitive (LES), For Official Use Only (FOUO), or similarly designated information that may relate to national security, law enforcement, or intelligence programs or operations, or disclosures that are reasonably likely to cause harm to any person.

### E.  Hiring Additional ICE Officers and Agents

To enforce the immigration laws effectively in the interior of the United States in accordance with the President's directives, additional ICE agents and officers are necessary. The Director of ICE shall—while ensuring consistency in training and standards—take all appropriate action to expeditiously hire 10,000 agents and officers, as well as additional operational and mission support and legal staff necessary to hire and support their activities. Human Capital leadership in CBP and ICE, in coordination with the Under Secretary for Management and the Chief Human Capital Officer, shall develop hiring plans that balance growth and interagency attrition by integrating workforce shaping and career paths for incumbents and new hires.

### F.  Establishment of Programs to Collect Authorized Civil Fines and Penalties

As soon as practicable, the Director of ICE, the Commissioner of CBP, and the Director of USCIS shall issue guidance and promulgate regulations, where required by law, to ensure the assessment and collection of all fines and penalties which the Department is authorized under the law to assess and collect from aliens and from those who facilitate their unlawful presence in the United States.

### G.  Aligning the Department's Privacy Policies With the Law

The Department will no longer afford Privacy Act rights and protections to persons who are neither U.S. citizens nor lawful permanent residents. The DHS Privacy Office will rescind the DHS *Privacy Policy Guidance memorandum*, dated January 7, 2009, which implemented the DHS "mixed systems" policy of administratively treating all personal information contained in DHS record systems as being subject to the Privacy Act regardless of the subject's immigration status. The DHS Privacy Office, with the assistance of the Office of the General Counsel, will

5

Exhibit 40
Page 19 of 20

develop new guidance specifying the appropriate treatment of personal information DHS maintains in its record systems.

### H. Collecting and Reporting Data on Alien Apprehensions and Releases

The collection of data regarding aliens apprehended by ICE and the disposition of their cases will assist in the development of agency performance metrics and provide transparency in the immigration enforcement mission. Accordingly, to the extent permitted by law, the Director of ICE shall develop a standardized method of reporting statistical data regarding aliens apprehended by ICE and, at the earliest practicable time, provide monthly reports of such data to the public without charge.

The reporting method shall include uniform terminology and shall utilize a format that is easily understandable by the public and a medium that can be readily accessed. At a minimum, in addition to statistical information currently being publicly reported regarding apprehended aliens, the following categories of information must be included: country of citizenship, convicted criminals and the nature of their offenses, gang members, prior immigration violators, custody status of aliens and, if released, the reason for release and location of their release, aliens ordered removed, and aliens physically removed or returned.

The ICE Director shall also develop and provide a weekly report to the public, utilizing a medium that can be readily accessed without charge, of non-Federal jurisdictions that release aliens from their custody, notwithstanding that such aliens are subject to a detainer or similar request for custody issued by ICE to that jurisdiction. In addition to other relevant information, to the extent that such information is readily available, the report shall reflect the name of the jurisdiction, the citizenship and immigration status of the alien, the arrest, charge, or conviction for which each alien was in the custody of that jurisdiction, the date on which the ICE detainer or similar request for custody was served on the jurisdiction by ICE, the date of the alien's release from the custody of that jurisdiction and the reason for the release, an explanation concerning why the detainer or similar request for custody was not honored, and all arrests, charges, or convictions occurring after the alien's release from the custody of that jurisdiction.

### I. No Private Right of Action

This document provides only internal DHS policy guidance, which may be modified, rescinded, or superseded at any time without notice. This guidance is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS.

In implementing these policies, I direct DHS Components to consult with legal counsel to ensure compliance with all applicable laws, including the Administrative Procedure Act.

Exhibit 40
Page 20 of 20

# EXHIBIT 49

to Declaration of Chris Swift in Response to
Defendants' Motion for Summary Judgment (Dkt. 167)

| | |
|---|---|
| **From:** | Myrna Orozco Gallos <morozco@cwsglobal.org> |
| **To:** | Noel Andersen <nandersen@cwsglobal.org>;Ingrid Encalada <ingrid83ivett@gmail.com>;Julie Peeples <julie@congregationalucc.com>;Julie Peeples <juliepeeples@gmail.com>;Carly Perez <cperez@detentionwatchnetwork.org>;Mary Small <msmall@detentionwatchnetwork.org>;Tania Unzueta <tania@mijente.net>;Maru Mora Villalpando <maruvillalpando@gmail.com>;Amy Gottlieb <AGottlieb@afsc.org>;achazaro@gmail.com <achazaro@gmail.com>;alicia.dinsmore@gmail.com <alicia.dinsmore@gmail.com> |
| **Sent:** | 1/29/2018 8:27:21 AM |
| **Subject:** | Today's Press Call - call info and other docs |
| **Attachments:** | Sanctuary in the Age of Trump January 2018.pdf |

Hi everyone -

I'm looking forward to hearing everyone later today on the press call. We've gotten some good interest from reporters so hopefully we'll have a good turnout. I'm sending this email with all of the information for later today. Below you'll find the relevant information but please let me know if you have any questions. I've also included a copy of our report that is on embargo until the call as well as a link to the call agenda with our talking points in case you want to add there as well.   Also, **please send a quote as soon as possible to be included in the release.** Alternatively, we're happy to pull one from prepared remarks, if you send those our way!

Thank you!
Myrna
-------------------------------------------------------------------------------------------------------------
Call agenda and talking points can be found <u>HERE.</u>

The final advisory that went out is available to view <u>HERE</u>, please send to your press list if you haven't done so already.

A document where we can start preparing our release is available <u>HERE</u>. We can all add and work on it in prep for Monday.

Please let me know if you have any questions.

1.      **Monday, January 29th at 3pm ET**: Please dial in by 2:45pm ET for a quick pre conference to go through the program quickly and any last minute details.

2.      **RELEASE: Please be sure to send your 2-3 line quote to Myrna Orozco (morozco@cwsglobal.org)**  before the start of the call, so we can include it in the press release.

3.      **SPEAKER CALL-IN INFO: DIAL IN** 800-459-5081; **PASSCODE** "SANCTUARY": **Please note the speaker dial-in is different than the number listed on the advisory.**

4.      **SUGGESTION SPEAKER ORDER**: Please plan to speak for 2-3 minutes, to leave ample time for q&a (speaker order can be modified.)

Exhibit 49
Page 1 of 2

CONFIDENTIAL

RESISTENCIA000573

- **Myrna Orozco,** Sanctuary Organizer, Church World Service, Moderator
- **Ingrid Encalada Latorr**e, currently in Sanctuary in Colorado, partner was recently also picked up by ICE.
- Rev. Julie Peeples, Senior Pastor at Congregational Church
- **Maru Mora Villalpando,** Organizer at the Northwest Detention Center Resistance. Mora-Villalpando was sent a deportation notice by ICE despite not having an open case against her.
- **Amy Gottlieb,** Associate Regional Director at the American Friends Service Committee Northeast Region. Gottlieb's husband, Ravi Ragbir, Executive Director of New Sanctuary Coalition of New York, was detained in New York City on January 11 at his regular check-in with ICE.
- **Alicia Dinsmore**, No More Deaths

--

**Myrna Orozco Gallos**
Sanctuary Communications and Organizing Associate
Immigration and Refugee Program
110 Maryland Avenue NE, Suite 110
Washington, DC 20002
P: 202.599.3585
F: 202.546.6232
Skype: morozco
morozco@cwsglobal.org

**Join our global homebase for refugee solidarity—because we are all** .

**Supporting our advocacy work is more important than ever. Go to** greateras1.org/donate/support-our-advocacy-efforts/ **to donate.**

*To share feedback about the services provided by CWS/IRP and our affiliate network, please email us at IRPfeedback@cwsglobal.org.*

Exhibit 49
Page 2 of 2

CONFIDENTIAL